IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES EDWARD DANIELS, | § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action 3:05-CV-1739-M |
| DALLAS COUNTY HOSPITAL DISTRICT, et al., | § § § § | |
| Defendants. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the District Court's Order, entered October 27, 2005, this case has been referred to the United States Magistrate Judge for pretrial management. Before the Court is Dallas County Hospital District's ("DCHD") Second Motion for Summary Judgment (doc. 122). Plaintiff James Edward Daniels ("Daniels") did not file a response to this motion and the time to do so has expired.

## BACKGROUND

On August 26, 2005, Daniels, proceeding *pro se*, initiated this lawsuit pursuant to 42 U.S.C. § 1983. (Pl.'s Compl. at 1.) Daniels was an inmate in Dallas County Jail on two occasions. The first was from June 5, 2003 until September 1, 2004, and the second was from June 15, 2005 until January 15, 2007. During those periods, Daniels alleges that he was denied medical treatment for problems associated with his kidneys and cancer in violation of his Eighth Amendment rights. (Pl.'s Compl. at 3.) Daniels argues that DCHD is liable for this violation because it was involved with monitoring and quality assurance for the medical care at DCHD pursuant to an "interlocal" agreement between DCHD and the University of Texas Medical Branch. (Unsworn Declaration of James Edward Daniels at 2.) Daniels requests compensatory damages in the amount $500,000 from

1

DCHD.  (*Id.* at 5.)

DCHD contends that there is no evidence that Daniels was denied adequate medical treatment. To the contrary, DCHD claims that Daniels' medical records and medical expert opinions demonstrate that Daniels was provided proper medical treatment and that any delay in receiving treatments was the result of Daniels own actions. As a result, DCHD seeks summary judgment on Daniels' claims.

## STANDARD OF REVIEW

The Court should only grant summary judgment if there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court views the facts in the light most favorable to the nonmoving party. *Whittaker v. BellSouth Telecomm., Inc.*, 206 F.3d 532, 534 (5th Cir. 2000). If the nonmovant bears the burden of proof at trial, the summary judgment movant may satisfy his burden by pointing to the absence of evidence supporting the nonmovant's case. *Id.* At this point, the nonmovant must show that summary judgment is not appropriate by going beyond the pleadings to demonstrate "specific facts showing that there is a genuine issue for trial." *Id.* Mere conclusory allegations or denials unsupported by specific facts are not enough. *Id.*

Since Plaintiff in this case is proceeding *pro se*, the Court must construe the allegations in the complaint liberally. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam); *Sec. & Exch. Comm'n v. AMX, Int'l, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993) (per curiam). The Court has an obligation to construe *pro se* plaintiffs' briefs more permissively and to make more allowances. *AMX, Int'l, Inc.*,

7 F.3d at 75. "[*P*]*ro se* litigant[s] [are] subject to less stringent standards than [those] represented by counsel." *Id.* (citing *Hughes v. Rowe*, 449 U.S. at 9).

## ANALYSIS

Daniels alleges that DCHD violated his Eighth Amendment right to adequate medical care when he was an inmate in the Dallas County Jail. The Eighth Amendment prohibits cruel and unusual punishments. U.S. CONST. amend. 8. This includes a duty to provide prisoners with adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The failure to provide an inmate with proper medical care, however, can only constitute "cruel and unusual punishment" if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (quoting *Estelle*, 429 U.S. at 106).

Deliberate indifference exists only when there is "an unnecessary and wanton infliction of pain," or though actions "repugnant to the conscience of mankind." *Id.* (quoting *Estelle*, 429 U.S. at 105–06). An Eighth Amendment claim has both an objective and subjective component. In order to satisfy the objective component, the plaintiff must show that the medical need at issue is "sufficiently serious." *Framer*, 511 U.S. at 834. To be liable under the subjective component, the plaintiff must show that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that the official did in fact draw that inference, and then disregarded that risk. *Id.* at 837.

Courts have found deliberate indifference in a variety of cases. For example, the decision of a doctor to throw away a prisoner's ear and to stitch the stump because it was easier than reattaching the ear, may be "attributable to 'deliberate indifference' . . . rather than an exercise of

3

professional judgment." *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974). The Seventh Circuit has held that injecting a prisoner with penicillin, knowing that the prisoner is allergic, and refusing to treat the allergic reaction constitutes deliberate indifference. *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974). It is important to remember that "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Allegations of physician negligence in diagnosing or treating a medical impairment does not rise to the level of deliberate indifference. *Thompkins*, 828 F.2d at 303. Likewise, unsuccessful medical treatment or medical malpractice does not amount to deliberate indifference. *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *see also Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (stating that unsuccessful medical treatment, negligence, neglect, and malpractice are insufficient to give rise to a § 1983 claim). Moreover, an inmate's disagreement with his medical treatment will not support a § 1983 claim. *Varnado*, 920 F.2d at 321.

Daniels claims that he informed the "medical staff that he had kidney problems with a small cnt[1] 1st (sic) on his kidney that disabled him and cause (sic) him a great deal of pain." (Pl.'s Compl. at 2.) He further asserts that he was not allowed to see a doctor during his incarceration at Dallas County Jail. (*Id.*) Daniels then alleges that "he made bond and went to the Dallas Veterans Administration Hospital . . . [where] he was given treatment and it was discovered that the small [cyst] on his left kidney had grown into a full blown tumor." (*Id.* at 3.) As a result, Daniels had surgery to have his left kidney removed. (*Id.*) When Daniels was re-incarcerated, he claims that he was not being treated for the removal of his kidney or for cancer. (*Id.*)

---

1. While Daniels refers to the mass on his kidney as a "cnt," his medical records indicate that it is actually a complex cyst. (*See* Bowers Mot. Summ. J. App. at 5.) The Court, therefore, understands "cnt" to refers to Daniels mass or cyst that eventually lead to the removal of his kidney.

4

The evidence does not support these conclusory assertions, and Daniels has failed to point to specific facts, which demonstrate that there is a genuine issue of material fact for trial. In support of its motion for summary judgment, DCHD provided the Court with Daniels' medical records from the Dallas County Jail Health Program, the Dallas County Sheriff Department, and the Veteran Affairs North Texas Health Care System ("V.A. Hospital"). (*See* DCHD Second Mot. Summ. J. App. at Ex. 2–4.) The summary judgment evidence also includes affidavits from two medical experts, Daniel Casey, M.D ("Dr. Casey") and Betty J. Williams, M.D ("Dr. Williams").

Daniels' medical records, as highlighted by the expert affidavits of Dr. Casey and Dr. Williams, are as follows. On June 4, 2001, prior to Daniels' first detention, he was a patient at the V.A. Hospital. At this time, Daniels was diagnosed with diabetes, hypertension, and a history of multiple kidney stones. (DCHD Second Mot. Summ. J. App. at Ex. 1, 7; Bowers Mot. Summ. J. App. at 4.) Daniels visited the V.A. Hospital again on June 29, 2001 for flank pain and blood in his urine. A computerized tomography ("CT") scan was completed, and a urologist was consulted, who recommended the usual kidney stone treatment, an ultrasound examination, and a follow up with urology in two weeks. (Bowers Mot. Summ. J. App. at 4.) On July 5, 2001, Daniels returned to the V.A. Hospital complaining of chills and a fever. (*Id.*) The radiology report of the CT scan conducted June 29, 2001 was available and showed a heterogeneous mass in the middle of his left kidney. (*Id.* at 5) The report indicated that this could be a complex cyst and recommended that Daniels have an ultrasound in two weeks. (*Id.*) Daniels did not keep his follow up appointment, and there is no record that the ultrasound or urology consult ever occurred. (DCHD Second Mot. Summ. J. App. at Ex. 1, 7; Bowers Mot. Summ. J. App. at 5.) Daniels did not return to the V.A. Hospital until January 22, 2002, at which time he only refilled his medication. (Bowers Mot. Summ. J. App.

5

at 5.)

The medical records show that an intake exam was conducted at Dallas County Jail on June 4, 2003; the day after his initial arrival. (*Id.*) Daniels' medical history was taken, which revealed asthma, diabetes, hypertension, and previous cerebrovascular accident. (*Id.*) However, Daniels did not report his previous problems with kidney stones, his abnormal CT scans, or the recommendations for follow up appointments with urology. (DCHD Second Mot. Summ. J. App. at Ex. 1, 7; Bowers Mot. Summ. J. App. at 5.) During his first incarceration, Daniels made numerous requests for sick call visits, but there is no mention of any complaint regarding his kidneys or the need for a specialty follow up. (Bowers Mot. Summ. J. App. at 5.) Daniels complained that he was not given a special diet, a "renal tray," but there was no medical necessity for him to receive such a diet. (DCHD Second Mot. Summ. J. App. at Ex. 1, 7; Bowers Mot. Summ. J. App. at 5.)

After his release, in September 2004, Daniels went to the V.A. Hospital for a follow up. (Bowers Mot. Summ. J. App. at 5.) An ultrasound was taken of his left kidney, which showed "a left renal mass, possible of neoplastic (cancerous) origin." (*Id.*) Another CT scan was conducted on November 3, 2004 that showed a "solid enhancing mass within the left kidney, not invading the renal vein." (*Id.*) Daniels was scheduled for a follow up with a urologist, but he did not show up for his appointment. (*Id.*)

Daniels did not meet with urology to discuss treatment options until April 12, 2005. (*Id.*) At this time, Daniels was told that the mass was probably cancerous, and that it required surgery and the possible removal of his left kidney. (*Id.*) During his surgery on May 5, 2005, the operating surgeon decided that removal of Daniels' left kidney was necessary. (*Id.*) The pathology report indicated that the tumor was "[c]lear cell carcinoma Grade II, limited to the kidney without invasion

of the renal artery or vein." (*Id.* at 6.) In Dr. Williams' opinion, these types of tumors are considered cured after removal and do not require chemotherapy or radiotherapy. (*Id.*)

On May 9, 2007, Daniels left the V.A. Hospital against medical advice, stating that he had to attend an appointment at the Courthouse. (*Id.*) Resident Physician M. Samuelson later called Daniels and told him he needed to return to the hospital. (*Id.*) Daniels did not return, despite promising that he would.

On June 15, 2005, Daniels was again arrested and re-incarcerated at Dallas County Jail. An intake examination was conducted on June 17, 2005. (*Id.*) His medical history revealed a history of kidney cancer, with recent surgery. (*Id.*) Urinalysis, chest x-ray, and blood urea nitrogen to creatinine ratio ("BUN/Creatinine") were normal, which indicates that his remaining kidney was functioning normally and that there was no evidence that the kidney tumor had spread to his lungs. (*Id.*) On September 21, 2005, a request was made for Renal Clinic follow up at Parkland Hospital. (*Id.*) This appointment was scheduled for November 7, 2005. (*Id.*) According to his medical records, Daniels refused this appointment. (*Id.*) On January 5, 2006, Dr. Blanton requested an appointment with oncology at Parkland Hospital, and on February 24, 2006, a nurse noted that Daniels signed a second release to the V.A. Hospital for his records because his name and social security number were wrong on the first request. (*Id.*)

A urology appointment was scheduled at Parkland Hospital for March 3, 2006. (*Id.*) It appears that Daniels attended this appointment and that a CT scan was recommended. (*Id.*) Another CT scan was ordered for November 8, 2006. (*Id.*) Dr. Williams states that this indicates that Daniels was receiving standard follow up appointments for kidney cancer. (*Id.*) The standard follow up schedule is to have a CT scan every six months for the first two years after surgery and

7

then annually for five years. (*Id.*)

On May 10, 2006, Daniels refused to go to a scheduled appointment at Parkland Hospital. (*Id.*) A clinic note from August 25, 2006 indicates that Daniels stated that he had been to oncology once. (*Id.*) Finally, on November 21, 2006, Daniels refused to go to an urology appointment at Parkland Hospital because he was being transferred to another jail. (*Id.*)

DCHD, through Daniels' medical records and the expert reports of Dr. Casey and Dr. Williams, has satisfied its burden of showing that there is no genuine issue of material fact. Daniels has not shown that the medical providers "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engage[d] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756. To the contrary, the evidence shows that Daniels was provided adequate medical care during both of his incarcerations. While Daniels makes the conclusory assertion that he informed the "medical staff that he had kidney problems with a small cnt 1st (sic) on his kidney that disabled him and cause (sic) him a great deal of pain," he does not indicate which members of the staff he told or when he told them. (Pl.'s Compl. at 2.) Daniels' medical records never mentioned any previous problems with kidney stones or the previous finding of a mass in his left kidney. (*Id.* at 6.) As a result, there was no need to obtain medical records from the V.A. Hospital or schedule any appointment with specialists. The complaints Daniels did make during his first incarceration were unrelated to problems with his kidneys. (*Id.* at 5.) Records from Daniels second incarceration also indicate that his medical providers acted properly after learning of his recent surgery. (*Id.* at 7.) His medical providers ordered appropriate labs, requested his records from the V.A. Hospital, and made appointments for Daniels with oncology, urology, and radiology. (*Id.*) Daniels, however, refused to attend some of

8

these appointments.

The medical records also demonstrate that any delay in diagnosing or treating Daniels did not result in any harm to Daniels. While Daniels claims that earlier diagnosis of his kidney cancer would have prevented the removal of his kidney, he has not provided specific evidence to support this assertion. In Dr. Williams' expert opinion, renal carcinoma is a slow growing tumor. (*Id.* at 7.) Up until recently, removal of the entire kidney has been the standard surgery. (*Id.*) When the cancer is located in the upper part of the kidney, surgeons now are sometimes able to remove only one half of the kidney. (*Id.*) According to Dr. Williams, the location of Daniels' tumor in the middle of his kidney required the surgeon to remove the entire kidney. (*Id.*) Daniels has not contradicted this opinion. Therefore, it does not appear that the timing of the discovery of kidney cancer was responsible for the removal of the entire kidney.

Daniels also claims that if his kidney cancer had been diagnosed and treated earlier, he would have a better prognosis. The kidney cancer was confined to Daniels's left kidney at the time it was removed. (*Id.*) Chemotherapy and radiotherapy were not required to treat Daniels' kidney cancer. (*Id.*) Accordingly, treating the cancer earlier would not have altered the course of treatment or changed his prognosis. (*Id.*) There is also no evidence that Daniels sustained irrevocable harm from the removal of his kidney. In her affidavit, Dr. Williams states that no medical evidence suggests that a person cannot function normally with only one kidney. (*Id.*) Daniels was found to have normal urinalysis and normal BUN/Creatinine both immediately after surgery and during his second incarceration at Dallas County Jail. (*Id.*) This evidence contradicts Daniels assertion that he sustained irrevocable harm because of his treatment at the Dallas County Jail.

Moreover, even if any delay harmed Daniels, the evidence shows that Daniels himself is

9

responsible for that delay. The evidence shows that Daniels was aware of a mass in the middle of his left kidney as early as July 5, 2001, yet never completed the recommended ultrasound. (*Id.*) There is no evidence that he ever reported problems with his kidney during his first incarceration, or that he sought any further treatment for the mass until after he was released from his first incarceration at Dallas County Jail. (*Id.*) Daniels also never attended a follow up appointment with urology after learning that the mass in his kidney might be cancerous. He waited five months before seeking treatment. Then four days after his surgery, he left the V.A. Hospital against medical advice and never returned. Accordingly, the evidence demonstrates that Daniels was responsible for any delay in his medical treatment.

The kidney tumor that Daniels had during his first incarceration was, arguably, "sufficiently serious." *See Framer*, 511 U.S. at 834. However, there is no indication that any medical provider was aware, or should have been aware, of that tumor or any risk of cancer. During Daniels' second incarceration, his recent surgery might be "sufficiently serious," but the evidence does not show that a "substantial risk of serious harm existed" or that the medical providers disregarded such a risk. *See id.* at 837. Instead, the evidence shows that the medical staff provided Daniels with appropriate care by ordering labs and making appointments with oncology, urology, and radiology.

Daniels has failed to present any competent expert testimony controverting the affidavits of Dr. Casey and Dr. Williams. He has failed to challenge any of the summary judgment evidence presented in this case, or offer his own evidence supporting his assertions. There is no indication that any one involved in Daniel's medical care caused an unnecessary or wanton infliction of pain. Accordingly, Daniels has failed to raise any genuine issue of material fact as to whether any medical provider was deliberately indifferent to his serious medical needs. The summary judgment evidence

10

supports DCHD's argument that Daniels was provided adequate medical care.

## **RECOMMENDATION**

For these reasons, the Court finds that no genuine issue of material fact exists. Accordingly, this Court recommends to the District Court that DCHD's second motion for summary judgment be **GRANTED** and that Daniels claims against DCHD be dismissed with prejudice.

**SO ORDERED.** March 18, 2008.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).